## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BOWEN UHLENKAMP AND
SADAF LAKHANI,

          Plaintiffs,

   v.

DISTRICT OF COLUMBIA,

          Defendant.

Case No. 21-cv-2662-TNM-MJS

### REPORT AND RECOMMENDATION

This Individuals with Disabilities Education Improvement Act ("IDEA") case returns to the Court after further administrative proceedings before the Hearing Officer on remand. Originally, Plaintiffs Bowen Uhlenkamp and Sadaf Lakhani ("Plaintiffs") filed suit in October 2021, after the Hearing Officer dismissed their claims at the administrative level. They challenged several individualized education programs ("IEPs") that the District of Columbia Public Schools ("DCPS" or the "District") prepared for their minor son, A.U., among other claims. On cross-motions for summary judgment, the Court rejected several of Plaintiffs' claims but saw merit in others, and it remanded to the Hearing Officer to reevaluate whether three challenged IEPs—from April, May, and December 2019—were substantively sufficient under the IDEA. The Hearing Officer then reassessed the record and issued a new written decision on those IEPs, concluding, once again, that DCPS met its burden to demonstrate their substantive adequacy under the statute. Now, Plaintiffs return to this Court to challenge the Hearing Officer's determination on remand. The parties filed a new round of cross-motions for summary judgment, which are before the undersigned by virtue of a referral for full-case management. After careful consideration of the

parties' briefing, the full administrative record, and the relevant authorities and caselaw, the Court concludes that the Hearing Officer ignored key evidence surrounding the April and May 2019 IEPs that reveals their insufficiency but reasonably found, in keeping with the Court's remand instructions, that the December 2019 IEP passed muster under the IDEA. So the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** both Plaintiffs' motion for summary judgment (ECF No. 67) and the District's cross-motion (ECF No. 70).

## STATUTORY FRAMEWORK

Congress enacted the IDEA to help ensure all children with disabilities receive a "free appropriate public education" or "FAPE." *See* 20 U.S.C. § 1400(d)(1)(A). This mandate "requires an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 403 (2017).

The "IEP"—or "individualized education program"—is "the centerpiece of the statute's education delivery system[.]" *Id.* at 391. An IEP is a "comprehensive plan prepared by a child's 'IEP Team'" through which "special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).[1] More specifically, an IEP must include "a statement of the child's present levels of academic achievement and functional performance," a list of "measurable annual … academic and functional goals," and "a description of how the child's progress toward meeting the annual goals … will be measured." 20 U.S.C. § 1414(d)(1)(A)(i). An IEP must also identify the "special education and related services … that will be provided" to help the child

---

[1] The composition of an "IEP Team" is prescribed by statute, 20 U.S.C. § 1414(d)(1)(B), and generally "includes teachers, school officials, and the child's parents," *Endrew F.*, 580 U.S. at 391.

"advance appropriately toward attaining the annual goals." *Id.* At least annually, the IEP team must review and revise a child's IEP "as appropriate." *Id.* § 1414(d)(4).

Broadly speaking, the IDEA requires that "'to the maximum extent appropriate,' public schools provide students with disabilities an education in the 'least restrictive environment' possible." *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 528 (D.C. Cir. 2018) (quoting 20 U.S.C. § 1412(a)(5)(A)). This generally means that the "removal of children from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (citation and quotation marks omitted). More simply put, "the IDEA requires that children with disabilities receive education in the regular classroom whenever possible." *Endrew F.*, 580 U.S. at 400 (citation and quotation marks omitted); *id.* at 401 ("[F]or most children, a FAPE will involve integration in the regular classroom[.]"); *Z.B.*, 888 F.3d at 528 (similar).

Two key principles guide any judicial review of an IEP. First, a court must focus on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399 (emphasis in original). After all, "Congress has not committed to educational perfection." *Z.B.*, 888 F.3d at 528; *see also Leggett v. Dist. of Columbia*, 793 F.3d 59, 70 (D.C. Cir. 2015) ("[A] public school district need not guarantee the best possible education or even a potential-maximizing one.") (citation and quotations marks omitted). Second, a court must assess an IEP's "substantive adequacy" based on information available at "the time each IEP was created rather than with the benefit of hindsight." *Edward M.R. v. Dist. of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (quoting *Z.B.*, 888 F.3d at 524). Putting these principles together, then, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or

3

reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to ensure the specific student's progress." *Z.B.*, 888 F.3d at 524.

## FACTUAL BACKGROUND

Plaintiffs' claims focus on three successive IEPs that DCPS proposed for A.U. in fifth and sixth grade (the 2018–19 and 2019–20 school years) while he attended Janney Elementary School ("Janney") and then Alice Deal Middle School ("Deal"), both public schools in Washington, D.C. Because the Court's prior decision addressed the complete factual backdrop here, *see Uhlenkamp v. Dist. of Columbia*, 691 F. Supp. 3d 224, 231–34 (D.D.C. 2023), this background discussion takes a more targeted approach, touching only on those details relevant to Plaintiffs' latest claims.

***The April 2019 IEP***.  DCPS first found A.U. eligible for special education services in April 2019, with an IDEA classification of multiple disabilities, specific learning disability, and other health impairment. With that eligibility determination, DCPS convened an IEP team (sometimes called a "multidisciplinary team") to meet and prepare an IEP, which Plaintiffs attended. The IEP focused on two areas of concerns—reading, as well as emotional, social, and behavioral development—and included goals for each. The IEP set two reading goals for A.U., namely that he: (1) "be able to independently determine one main idea of a text and support it with at least 2 pieces of evidence," and (2) "be able to independently determine one theme of a fiction text and support it with at least 2 pieces of evidence." The IEP prescribed forty-five minutes per week of specialized instruction in reading to be provided in the general education setting (*i.e.*, "push-in" support) and sixty minutes per month of behavioral support services outside general education (*i.e.*, "pull-out" support), plus a range of other classroom aids and services. (*See* Administrative

Record ("AR") at 200–07.)[2] The aids and services included preferential seating, checklists and notes for multi-step directions, breaking new information into smaller "chunks," speech-to-text technology, multi-modal instruction to address orthographic concerns, and more. (*See id.* at 204.)

*The May 2019 IEP*.  The following month, DCPS convened another meeting to update A.U.'s IEP, which Plaintiffs again attended. That May 2019 IEP yielded two notable changes. One, it added written expression as an area of concern and identified a couple of related goals, along with an additional hour per week of push-in specialized instruction in written expression. And two, it modified the hour of monthly behavioral support services for A.U. so that it would be split between push-in and pull-out support—thirty minutes for each. For reading, the IEP carried forward the same two goals and the same level of specialized instruction. The IEP likewise maintained the same classroom aids and services as the prior month's IEP. (*See* AR at 286–95.)

*The December 2019 IEP*.  For the 2019–20 school year, A.U. advanced to middle school and started his sixth-grade year at Deal. A few months into the year, an IEP team convened again to review A.U.'s IEP. Plaintiffs attended the December 2019 IEP meeting, too, along with their educational consultant, Amy Mounce, who reviewed and provided input on a draft IEP beforehand. (AR at 399–402.) DCPS adopted much of that input. The resulting December 2019 IEP yielded several material changes. One, it expanded and built upon the prior goals in reading, written expression, and emotional, social, and behavioral development.[3] Two, it considerably amplified

---

[2] The District's filing of the original Administrative Record on April 7 and 8, 2022 spanned dozens of docket entries, followed by numerous "errata." (ECF Nos. 10–29.) The Court directs the reader to the District's "Administrative Record Chart" (ECF No. 41-1), which correlates AR pages to the corresponding ECF entries. Separately, in the wake of Plaintiffs' supplemental complaint after remand, the District filed another administrative record on July 23, 2024 (ECF No. 66), which starts numbering again at page 1. To avoid confusion, the Court refers to the latter submission as the Remand Administrative Record ("RAR").

[3] For reading, in particular, the IEP prescribed three new goals: (1) "With use of a graphic organizer after reading an informational grade level text, [A.U.] will be able to independently determine the main idea of a grade level text and support it with 2 pieces of text evidence scoring 80% on 2 out of 3 tasks"; (2) "When

A.U.'s special education service hours, increased to a total of eight hours per week—split across two hours of push-in support in written expression, two hours of push-in support in reading, and another four hours of pull-out services in reading. The pull-out reading services would be provided in the form of a reading intervention class in a small-group setting. Three, the IEP added a new area of concern—adaptive/daily living skills—along with a corresponding goal. And four, it more than doubled A.U.'s behavioral support services to two-and-a-half hours per month—thirty minutes of push-in support and two hours of pull-out services. (*See id.* at 499–513.)

*A.U.'s Private School Placement.* Shortly after the December 2019 IEP meeting, Plaintiffs began exploring other schools. In August 2020, Plaintiffs—through legal counsel—advised DCPS that they were choosing to enroll A.U. at the Siena School ("Siena"), a private school in Maryland, for his upcoming seventh-grade year and requesting that DCPS fund that placement. (AR at 1021–22.) The District declined funding based on its position that DCPS made a FAPE available to A.U. through an appropriate IEP—the December 2019 IEP—and a continued placement at Deal for the 2020–21 school year. (*Id.* at 825.) All the same, Plaintiffs opted for A.U. to begin seventh grade at Siena, where the Court understands he remains enrolled today.

## PROCEDURAL BACKGROUND

Plaintiffs filed their underlying due-process complaint in January 2021, alleging that DCPS violated the IDEA by: (1) violating the IDEA's "child-find" obligation in failing to identify A.U. as eligible for special education services prior to 2019; (2)–(4) failing to provide an appropriate IEP for A.U. in April, May, and December 2019; (5) failing to offer an appropriate IEP and

---

given an instructional grade level passage, [A.U.] will read the passage aloud at a rate of at least (120) words per minutes with (96%) accuracy … and apply (3) teacher-selected intonation and expression skills"; and (3) "Given an unfamiliar instructional grade level passage with (15) teacher-selected words (e.g., words with common prefixes and suffices, multisyllabic, or irregularly spelled words), [A.U.] will read the passage aloud and correctly decode the selected words with (80%) accuracy[.]" (AR at 501–03.)

placement prior to the 2021–22 school year, necessitating Plaintiffs' unilateral placement at Siena; and (6) failing to properly implement the May and December 2019 IEPs. *See Uhlenkamp*, 691 F. Supp. 3d at 234 (citing AR at 1203–04). As relief, Plaintiffs requested reimbursement for tuition and related expenses they incurred by placing A.U. at Siena, along with related remedies.

Following a four-day administrative hearing in May and June 2021, the Hearing Officer issued a determination in July 2021 that ruled against Plaintiffs and dismissed their due-process complaint. (AR at 4–39.) Plaintiffs then timely sought review in this Court. (ECF No. 1, Compl.) On cross-motions for summary judgment, former Magistrate Judge Robin M. Meriweather issued a split-decision report and recommendation on Plaintiffs' claims—agreeing with both sides in certain respects—which District Judge Trevor N. McFadden then adopted in full. *Uhlenkamp*, 691 F. Supp. 3d 224.[4] On the one hand, the Court sided with the District on Plaintiffs' child-find and implementation claims. It held that the Hearing Officer reasonably determined that DCPS did not violate the IDEA by not sooner identifying A.U. as eligible for special education services, and it agreed that Plaintiffs failed to meet their burden to show that DCPS failed to implement substantial or significant provisions of the May and December 2019 IEPs. *See id.* at 237–39, 247–50. On the other hand, the Court sided with Plaintiffs on their challenges to the substantive adequacy of the April, May, and December 2019 IEPs, ordering a remand to the Hearing Officer on those claims. *Id.* at 239–47. The Court declined to pass on Plaintiffs' tuition-reimbursement claim given that issue's interrelatedness to the December 2019 IEP's adequacy, and it directed the Hearing Officer to revisit that claim on remand, too, as appropriate. *Id.* at 250–51.

The proceedings then returned to the Hearing Officer, who reevaluated the existing record, including the testimony and evidence presented during the original hearing. In December 2023,

---

[4] Neither Plaintiffs nor the District filed objections to Judge Meriweather's report and recommendation.

the Hearing Officer issued a new determination on remand. (RAR at 4–60.) Although the remand determination retained some pieces of the original decision, the Hearing Officer expanded considerably on his factual findings (*id.* at 28–39 (¶¶ 30–37)) and prepared updated conclusions of law addressing Plaintiffs' challenges to the various IEPs (*id.* at 40–57). The Hearing Officer ultimately adhered to his prior determinations, concluding that DCPS carried its burden to show that all three IEPs were reasonably calculated to enable A.U. to make educational progress. (*Id.*)

The next month, in January 2024, Plaintiffs filed a supplemental complaint in this Court to challenge the remand determination. (ECF No. 63, Supp. Compl.) Following submission of the new administrative record, the parties filed dueling motions for summary judgment, which are ripe for resolution. (ECF No. 67 ("Pls.' Mem."); ECF No. 70 ("Def.'s Mem.").)

## LEGAL STANDARDS

Although motions seeking review of a hearing officer's decision under the IDEA are often framed as motions for summary judgment, the Court does not follow "a true summary judgment procedure" in this context. *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)). Rather, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the court may receive." *D.R. v. Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Put another way, a motion for summary judgment is "the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.G. v. Dist. of Columbia*, 246 F. Supp. 3d 1, 8 (D.D.C. 2017) (citation omitted).

On judicial review under the IDEA, courts "shall grant such relief as [they] determine[] is appropriate," based upon "a preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Rowley*, 458 U.S. at 205–06. In doing so, courts may not "substitute their own notions of

sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, courts "must give due weight to the administrative proceedings and afford some deference to the expertise of the [independent hearing officer] and school officials responsible for the child's education." *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 109 (D.D.C. 2010) (citation and quotation marks omitted). In general, "a hearing officer's findings based on credibility determinations of live witness testimony are given particular deference where there is no supplementation of the record." *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014) (citation and quotation marks omitted). But "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991)).

## DISCUSSION

Plaintiffs mount two overall attacks on the remand determination. First, they insist that the Hearing Officer wrongly adhered to his original conclusion that the various IEPs were substantively sufficient under the IDEA. Second, Plaintiffs say the Hearing Officer should have awarded them tuition and expense reimbursement for Siena for the 2020–21 school year.

## I.    The IEPs' Substantive Adequacy

### A.    The April 2019 IEP

The Court frames its review of the April IEP around the specific instructions given to the Hearing Officer on remand: to fully and appropriately address "whether the IEP's lack of orthographic progressing goals made the April 2019 IEP inadequate and whether additional hours of specialized instruction [were] warranted." *Uhlenkamp*, 691 F. Supp. 3d at 242.

Begin with the IEP's omission of any orthographic processing goal(s).[5] On remand, the Hearing Officer squarely identified this point and Plaintiffs' corresponding objection. (*See* RAR at 43 ("The IEP acknowledged [A.U.'s] orthographic processing deficit … but did not include a goal that specifically addressed it."); *see id.* (describing testimony from Plaintiffs' expert consultant, Ms. Mounce, that A.U.'s "primary reading deficit was orthographic processing" and that "the IEP was inappropriate because it did not include reading goals specifically addressing this deficit").) The Hearing Officer then addressed *some* of the evidence in the record—including A.U.'s assessment data, Ms. Mounce's opinions, and more—to conclude that the IEP's non-inclusion of any orthographic processing goal(s) did not render the IEP inadequate. The Hearing Officer deemed Ms. Mounce's testimony unpersuasive and reasoned, instead, that A.U.'s orthographic processing deficit could be addressed through other classroom aids and services prescribed by the IEP—a perspective the Hearing Officer ascribed to DCPS and its witnesses. (RAR at 44–46.) Plaintiffs attack this conclusion from several angles, including that it misconstrues evidence and ignores testimony from DCPS's own expert who they say acknowledged that an orthographic processing goal should have been included on the IEP.

This last point is one the Court's prior ruling expressly identified as warranting further focus on remand. The ruling explained that the Hearing Officer "failed to address relevant evidence" regarding orthographic processing, including the fact that "the District's own witnesses said that orthographic goals should have been on the IEP[.]" *Uhlenkamp*, 691 F. Supp. 3d at 242

---

[5] The parties' expert witnesses defined orthographic processing as "recognizing parts of words and letters[] and remembering how to put them together," *i.e.*, "identify[ing] words based on the visualization of that word." (AR at 1943 (Ms. Mounce); *id.* at 2425 (Dr. Mallory).) Orthographic processing is closely related to reading fluency: "[I]t's being able to look at something and break it apart, but immediately recognize it and do it in a pace, as we refer to as the fluency, how quickly, at a pace that allows him to automatically recognize words or recognize how to write words and get that information out." (*Id.* at 1943 (Ms. Mounce).)

(citing AR at 2472 (testimony of Dr. Mallory)). Plaintiffs complain that the Hearing Officer failed to address this evidence once again. (Pls.' Mem. at 26–27.) They are correct.

Specifically, Dr. Mallory—one of DCPS's experts, who participated in the development of the April and May 2019 IEPs—agreed in her testimony that A.U. "needed to have services that addressed [his] orthographic processing deficit." (AR at 2447.)[6] She acknowledged that the absence of an IEP goal for the "orthographic piece … may have been an omission," and she stood by that testimony in response to follow-up questions from the Hearing Officer directly:

> [HEARING OFFICER]: Dr. Mallory, what did you say was … an omission?
>
> THE WITNESS: The lack of a goal for the text orthography, which would have been part of the word attack.
>
> [HEARING OFFICER]: There was no goal for word attack?
>
> THE WITNESS: Right. Before being able to, again, see regular words and be able to identify them accurately.
>
> [HEARING OFFICER]: Okay. That was the orthographic process?
>
> THE WITNESS:  Orthographic processing.

(*Id.* at 2457–58.) Earlier in her testimony, Dr. Mallory said that "a goal related to text orthography could have been important" and "may have been missed." (*Id.* at 2449 ("I'm not saying that … a goal related to orthographic processing may not have been missed. I'm not saying that it was not missed …. I'm not saying that it was -- that that was not an oversight."). And perhaps most directly, DCPS's own counsel asked Dr. Mallory on redirect whether A.U. needed orthographic goals on his IEP as of April or May 2019, and after a largely non-responsive answer at first—which the Hearing Officer corrected—Dr. Mallory told the Hearing Officer, "it should have been on the IEP."

---

[6] Dr. Mallory agreed, more specifically, that the results of the March 2019 assessment indicated that A.U. had a learning disability in reading in the areas of both orthographic processing and reading fluency. Orthographic processing, she testified, "is how well a child can identify words based on the visualization of that word," while reading fluency is "how quickly a child reads." (AR at 2424–25.) She said A.U. would benefit from specialized instruction in both orthographic processing and reading fluency. (*Id.* at 2426.)

(*Id.* at 2472.)[7] This final excerpt was the exact evidence the Court highlighted as having been overlooked the first time around. And even still, the Hearing Officer glossed over it once again, along with Dr. Mallory's broader testimony on these points.

More than that, the Hearing Officer did not just elide this testimony but described it as something altogether different. The remand determination credits Dr. Mallory (*i.e.*, "Witness G") as testifying that "orthographic processing could also be addressed through Other Classroom Aids and Services." (RAR at 45.) But Dr. Mallory never said that, certainly not as directly as the Hearing Officer suggested. The remand determination cited no transcript page(s) to support that characterization, DCPS does not identify testimony to this effect in its briefs, and the Court could not locate any such testimony through its own review of the record.[8]

The Hearing Officer's continued non-engagement with Dr. Mallory's actual testimony regarding orthographic processing goals—even after the Court highlighted the issue directly in its original ruling—scuttles any reliability as to the remand determination's factual findings on this point. *E.W. v. Dist. of Columbia*, 2023 WL 11835292, at *13 (D.D.C. Nov. 28, 2023) (recognizing that a hearing officer's findings may be "disturbed" where the findings "ignored probative evidence"), *report & recommendation adopted*, 2023 WL 11835259 (Dec. 13, 2023); *Shipley v. Dist. of Columbia*, 2020 WL 13669941, at *10 (D.D.C. Mar. 6, 2020) (same where hearing officer

---

[7] This full exchange went: "Q: At the time in May -- April or May 2019 with the test scores or how he was presenting in the informal tests, we saw the Fountas & Pinnell, all of them, was he presenting as a need to have orthographic goals on his IEP? A: I would say that based on Dr. Schlegelmilch's report, based on what we had as far as Fountas & Pinnell and a lot of those other things, he seemed -- it seemed like he was, you know, staying afloat. But based on Dr. Schlegelmilch's data, some of those weaker skills were in that area. [HEARING OFFICER]: It doesn't seem to answer the question. THE WITNESS: So, I could say that it should have been on the IEP. [HEARING OFFICER]: Okay. That answers the question." (AR at 2472.)

[8] Dr. Mallory did say the various classroom aids and supports were "appropriate based on [A.U.'s] needs at the time," but she did not testify that they were aimed at A.U.'s orthographic processing deficit or were sufficient for that purpose in lieu of any related goal(s). (*See* AR at 2437–38.)

"wholly ignore[d] the conflicting evidence"), *report & recommendation adopted*, 2020 WL 13669870 (D.D.C. Mar. 24, 2020). The Court would be facing a different scenario if the Hearing Officer had recognized and addressed Dr. Mallory's testimony on orthographic processing goals and explained, perhaps, why he believed that testimony was not compelling or significant. *Cf. Jackson v. Dist. of Columbia*, 2020 WL 3318034, at *14 (D.D.C. June 2, 2020) ("By noting the contradictory evidence in the record and explaining why that evidence did not compel an opposite conclusion, the Hearing Officer did not err."), *report & recommendation adopted*, 2020 WL 3298538 (D.D.C. June 18, 2020). But that is not what happened. The Hearing Officer's analysis on remand did not even acknowledge that testimony, much less engage with it substantively.

If this case were on review for the first time, the Court would likely remand to afford the Hearing Officer an opportunity to address that evidence in the first instance. But the Court already tried that without success. So the Court instead deems it appropriate to weigh any conflicting evidence itself *de novo*. *Shipley*, 2020 WL 13669941, at *10 (citing *Reid*, 401 F.3d at 521).

That undertaking is about as straightforward as it comes because there is no real conflict. After all, experts on both sides opined that A.U. needed specialized instruction to address his orthographic processing and fluency deficits and that his IEP should have included goals focused on orthographic processing. (AR at 1941, 2025–27 (Ms. Mounce); *id.* at 2447, 2449, 2457–58, 2472 (Dr. Mallory).) And experts on both sides acknowledged that the IEP's only reading goals were not aimed at addressing those deficits. (*Id.* at 2025 (Ms. Mounce: "[T]here are two reading goals that both address comprehension …. There's nothing that addresses the deficits in orthographic processing."); *id.* at 2462 (Dr. Mallory agreeing that the "a theme goal and a main idea goal … were not going to address the things that were going on with [A.U.']s reading … in terms of the orthographic piece").) Despite this evidence, the Hearing Officer reasoned that some

of the IEP's classroom aids and services were a reasonable substitute for orthographic processing goals—even attributing that thinking to DCPS and the team that prepared the April IEP. (RAR at 46 ("[S]chool staff believed that [A.U.'s] orthographic processing deficits could be adequately addressed through Classroom Aids and Services."); *id.* ("Thus, the IEP team reasonably concluded that [A.U.'s] deficit could be addressed through Classroom Aids and Services.").) Again, though, Dr. Mallory never said that, and she was part of the "school staff" and "IEP team" that developed the April 2019 IEP. In fact, Dr. Mallory said the opposite: that an orthographic processing goal "should have been included" on the IEP. (AR at 2472.)[9] Without any attempt to explain how that evidentiary conflict could be consistent with a finding that no orthographic processing goal was necessary, the Hearing Officer's determination cannot be squared with the record. The Court concludes, therefore, that Plaintiffs met their burden to show the Hearing Officer was wrong in finding the April IEP to be sufficient despite the absence of any orthographic processing goal(s).

That leaves the issue of whether the April IEP prescribed sufficient "hours of specialized instruction." *Uhlenkamp*, 691 F. Supp. 3d at 242. This issue received far less attention from the parties, which is perhaps understandable since it received far less attention from the Hearing Officer, too. As best the Court can tell, the Hearing Officer disagreed that A.U. required "an overabundance of specialized instruction outside general education," concluding instead that he needed only "minimal additional support," which presumably meant the 45 minutes per week of push-in specialized instruction prescribed by the IEP. (RAR at 46.) The Hearing Officer's rationale

---

[9] The only other witness the Hearing Officer cited for this proposition was Arielle Edge, another DCPS school psychologist. According to the remand determination, she "opined that the multimodal instruction prescribed in the IEP would address [A.U.'s] orthographic processing needs." (RAR at 46.) Although true that Ms. Edge testified that "multi-modal instruction would provide [an] access point that would prevent orthographic processing from being a barrier" (AR at 2293), she did not state that it was sufficient to take the place of one or more goals focused on that deficit. And in any case, if the Hearing Officer was crediting this testimony over Dr. Mallory's statements regarding orthographic processing goals, the remand determination needed to engage with that conflicting testimony and explain as much. It did not.

here was likewise grounded in his skepticism of Ms. Mounce's opinions, which he believed were "not supported by the record" and "belied" by other evidence. (*Id.* at 44 (disagreeing that A.U.'s orthographic processing deficit was "significan[t] to [his] overall profile" and highlighting a variety of "average range" scores in different reading categories on A.U.'s March 2019 evaluation)). But that analysis, once again, ignores the testimony from DCPS's own witness—Dr. Mallory—along these same lines. Dr. Mallory said that A.U. needed specialized instruction to address his orthographic processing and fluency deficits in reading. (AR at 2426.) Thus, even assuming the Hearing Officer appropriately viewed Ms. Mounce's testimony as unpersuasive and reasonably assessed that A.U. was generally reading at grade level based on information available to the IEP team in April 2019, Dr. Mallory's testimony still points strongly toward a need for additional specialized instruction in certain reading areas to address A.U.'s particular deficits. The Hearing Officer did not explain why DCPS carried its burden to show that the IEP's minimal special education hours were sufficient against those facts.

Accordingly, for these reasons, the Court should find that the Hearing Officer erred in determining that the April IEP was substantively sufficient. The District did not carry its burden to show that the IEP was reasonably calculated to ensure A.U.'s educational progress.

**B.    The May 2019 IEP**

Next up is the May IEP. It did not modify any of the reading-related components of A.U.'s program, whether the goals or the specialized instruction hours. Instead, the May IEP made other changes, including: (1) adding written expression as an area of concern for A.U., (2) adopting a few goals focused on written expression, (3) tacking on another weekly hour of push-in specialized instruction in written expression, and (4) adjusting A.U.'s behavioral support services schedule. The Court previously remanded on this claim because the Hearing Officer "provided only a

conclusory assertion that the May 2019 IEP is adequate because the student's situation had not materially changed in one month." *Uhlenkamp*, 691 F. Supp. 3d at 244. The remand determination did better, but the Hearing Officer still grounded his finding that the May IEP was appropriate in the antecedent finding that the April IEP was appropriate. (RAR at 48 ("The May IEP added additional services to the April IEP that I concluded had provided a FAPE. Therefore, I conclude that DCPS has met its burden of proving that it is more likely than not that the IEP it developed on May 30, 2019 was reasonably calculated to enable [A.U.] to make academic progress.").) This reasoning fails because the same deficiencies in the April IEP—the absence of orthographic processing goals and related specialized instruction—carry forward to the May IEP.

Beyond that, the parties' briefing largely debates whether the Hearing Officer properly considered the import of two reading assessments administered between the April and May IEPs: the Scholastic Reading Inventory ("SRI") test, which showed A.U. performing below basic grade level, and the Fountas and Pinnell assessment ("F&P"), which showed A.U. performing more or less on grade level. (*See* RAR at 21 (describing results); Pls.' Mem. at 36; Def.'s Mem. at 13–15.) The Hearing Officer discounted the significance of the lower score in reliance on a DCPS witness who said the SRI results were "an outlier based on [A.U.'s] classroom performance and all other assessment data." (RAR at 48.) Plaintiffs call that conclusion wrong, while the District defends it as appropriate. But setting aside whether the Hearing Officer reasonably weighed the competing evidence on that point, the fact remains that the May IEP—like the April IEP—did not include any goals that related to orthographic processing, which DCPS's own expert, Dr. Mallory, said should have been included. (AR at 2472.) The IEP's two reading goals remained unchanged and focused on comprehension rather than the orthographic and fluency deficits that needed support. So the Court's analysis of the April IEP's deficiency maps directly onto the May IEP.

For this reason, the Court should likewise hold that the Hearing Officer erred in finding the May IEP to be substantively sufficient because the District did not carry its burden to show that the IEP was reasonably calculated to ensure A.U.'s educational progress.

### C.    The December 2019 IEP

That leaves the December IEP. The Court remanded on this claim because it found that the original decision "glossed over key issues … such as A.U.'s orthographic processing deficits and [his] stutter" and otherwise "failed to address several of Plaintiffs' arguments." *Uhlenkamp*, 691 F. Supp. 3d at 245–47. In reassessing the evidence and arguments surrounding the December IEP, the Hearing Officer determined on remand that it met the IDEA's mandate: the IEP was reasonably calculated to enable A.U. to make progress based on his circumstances. The Court agrees.

As a starting point, the Court believes it helpful to compare the December IEP to the two preceding IEPs that missed the mark. The December IEP updated and meaningfully expanded upon A.U.'s reading goals, adding two new goals focused on fluency while retaining one modified comprehension-related goal. (AR at 502–03.) Thus, in contrast to the reading goals in the earlier IEPs, which focused exclusively on comprehension, the December IEP crafted goals that were better aimed at A.U.'s deficits in orthographic processing and fluency. More, the December IEP increased A.U.'s specialized education hours fourfold, up from around two hours weekly to eight hours weekly. (*Id.* at 509.) Half those hours (four out of eight) were allocated to dedicated pull-out education in reading, meaning A.U. would receive targeted reading instruction every day from a special education teacher in a small-group environment. Simply put, the December IEP filled in— reasonably, even if not perfectly—the main gaps that rendered the prior IEPs inadequate. It included goals targeting A.U.'s specific reading deficits, and it expanded considerably on A.U.'s

special education instruction including through a targeted reading intervention in a more hands-on setting. These modifications alone go a long way toward showing the sufficiency of the IEP.

The remand determination hooked into these points. The Hearing Officer observed, as a general matter, that the updated reading goals addressed not only "reading comprehension," but also "reading fluency" and "reading aloud and decoding." (RAR at 53.) For this reason, the Hearing Officer explained, he was unpersuaded by Ms. Mounce's various criticisms about the overall focus of the reading goals. (*See id.*) Plus, the Hearing Officer pointed out that none of the final reading goals were included in the original draft IEP, meaning that Ms. Mounce's input on the draft "had a discernible impact on the development of the IEP goals" in the final version. (*Id.*) More, as to the increased instruction, DCPS placed A.U. in a "reading intervention program," a specialized "reading support class for five days each week." (*Id.* at 56.) DCPS witnesses explained that this program—the Strategic Adolescent Reading Intervention ("STARI")—"would address fluency, comprehension, and decoding." (*Id.* at 52–53.) Particularly with these "additional services," the Hearing Officer concluded that the IEP "would reasonably be expected to enable [A.U.] to continue to make academic progress." (*Id.* at 57.) This time around, the Court agrees that the Hearing Officer's determination on that score was reasonable and reasonably supported.

Plaintiffs insist otherwise. Their arguments are meandering and often difficult to follow, largely due to their choice to brief their challenges through what amounts to a paragraph-by-paragraph commentary on how the remand determination differs from the original decision. (Pls.' Mem. 36–44.) Even still, the Court distilled their points as best it could. None persuades.

The most consistent objection Plaintiffs raise is that the Hearing Officer improperly weighed the evidence and should have reached different conclusions based on the record presented. (*See* Pls.' Mem. at 44 ("Had the [Hearing Officer] weighed the evidence properly, he should have

found that DCPS failed to prove the December 2019 IEP appropriate[.]").) For instance, Plaintiffs say the Hearing Officer wrongly credited certain of A.U.'s assessment and testing results over others, placed too much weight on A.U.'s grades (which Plaintiffs call "inflated"), and neglected to appropriately evaluate evidence of A.U.'s executive functioning deficits. These all boil down to disagreements about how the Hearing Officer weighed the evidence. And those types of arguments cannot carry the day. *Garris v. Dist. of Columbia*, 210 F. Supp. 3d 187, 190 (D.D.C. 2016) ("[T]hese objections are about how the Hearing Officer weighed the evidence .... That Plaintiffs draw a different conclusion from that evidence does not make the Hearing Officer's alternative conclusion improper."); *A.W. v. Dist. of Columbia*, 2014 WL 12884524, at *5 (D.D.C. Sept. 19, 2014) (reiterating that IDEA plaintiffs cannot secure reversal simply because "some evidence in the record, if given substantial weight, could support a finding in their favor").

Beyond that, Plaintiffs voice disagreement with the STARI program—A.U.'s daily reading intervention class—as insufficient to address A.U.'s reading deficits because STARI was not an intervention to specifically target orthographic processing. (Pls.' Mem. at 41.) On this point, though, the Hearing Officer credited the testimony of Ms. Edge (*i.e.*, "Witness D") (*see* RAR at 34–35), who testified that STARI was designed to address a wide range of reading skills, including "decoding," "word patterns," and taking "orthography" and other "basic reading skills" and applying them "in the context of reading comprehension." (AR at 2287–88; *id.* at 2317–18 (Ms. Edge testifying similarly).) In other words, even though STARI was not singularly focused on orthographic processing, as other DCPS witnesses acknowledged (*see* AR at 2507, 2571), the program's multi-faceted approach to reading skills was something DCPS believed would help improve A.U.'s reading deficits. The Hearing Officer's decision to credit that explanation was reasonable. After all, unlike the clear contradictions created by Dr. Mallory's testimony regarding

the April and May IEPs—*i.e.*, that they should have included orthographic processing goals—no DCPS witness testified the December IEP should have included a different reading intervention or that the STARI program was not enough to support A.U.'s specific circumstances, even though Plaintiffs pressed that contention at various points in the administrative hearing.

Relatedly, Plaintiffs argue that the Hearing Officer improperly brushed aside Ms. Mounce's objections about the specific benchmarks in the IEP's reading goals. She took issue with the first reading goal's target that A.U. would read and comprehend grade-level text. But the Hearing Officer found that objection unpersuasive because A.U.'s assessment data, considered as a whole, showed that his reading comprehension skills—notwithstanding other deficits—were largely average compared to his same-aged peers. (RAR at 50.) On the second goal's target that A.U. should read at 120 words per minute, Ms. Mounce objected because the recent data showed he was reading at a meaningfully slower rate. In the Hearing Officer's view, however, the fact that this target was a "stretch objective" did not necessarily render the goal inappropriate, especially since A.U. would be receiving "significantly more individualized reading instruction than [he] had ever before received." (*Id.*) The remand determination's engagement with and rejection of these objections from Ms. Mounce was reasonable, as was the overall assessment that the reading goals were appropriate. *See Endrew F.*, 580 U.S. at 402 (observing that "every child should have the chance to meet challenging objectives," such that IEPs should be "appropriately ambitious").

Plaintiffs separately argue that the Hearing Officer failed to consider A.U.'s stutter. (Pls.' Mem. at 20–22, 39.) The remand determination acknowledged that A.U. developed a stutter in sixth grade, before the development of the December 2019 IEP. But the Hearing Officer reasoned that the IEP's failure to explicitly address the stutter did not render it inadequate because there was "no persuasive testimony, expert or otherwise, that stuttering impaired [A.U.'s] ability to access

the curriculum in the general education environment." (RAR at 56.) That is not to say there was no testimony presented on the subject. A.U.'s special education reading teacher, Kendra Wells, described A.U.'s stutter when he read aloud in class but said that it was variable—"a day to day thing"—and that A.U. was often able to mitigate it, at least somewhat, by using a fidget to help with feelings of anxiety. (AR at 2560–61.) But as the Hearing Officer noted, there was nothing in the record to show that Plaintiffs—through Ms. Mounce or otherwise—pressed DCPS to implement any changes to the IEP based on concerns about A.U.'s stutter; Ms. Mounce did not include anything about A.U.'s stutter in the draft IEP she marked up, and her meeting notes do not indicate that she or A.U.'s parents asked for more support on the issue. (*Id.* at 446–56, 514–18.)[10] On balance, the Hearing Officer evidently evaluated this point alongside the fact that the December IEP provided A.U. with targeted reading instruction every day in a small-group setting, to include practice reading aloud. Plus, inasmuch as the stutter was reportedly attributable to A.U.'s anxiety, the December IEP increased the behavioral support hours to help A.U. advance on his emotional, social, and behavioral development goals, including to better manage anxiety. (AR at 507–09.) Given all this, it was reasonable for the Hearing Officer to conclude that the IEP was not inadequate on the basis that it did not include even more support focused explicitly on the stutter.

Finally, Plaintiffs argue that the IEP was improper because it did not memorialize all the hours of support A.U. was receiving in Math and ELA. In other words, Plaintiffs appear to be complaining about services that A.U. *did receive*, but that were not written into the IEP for some reason. (Pls.' Mem. at 6 ("A.U. received and needed daily inclusion in ELA and Math … but it was not on his IEPs."); *see* AR at 2085 (Ms. Mounce testifying about the December IEP that A.U.

---

[10] The meeting notes do refer to A.U.'s stutter, but it was raised by A.U.'s reading teacher, Ms. Wells, not Ms. Mounce or Plaintiffs. (AR at 516.) And Ms. Wells, according to the notes, went on to describe her ideas and efforts for how to help A.U. improve that issue and others. There is no other mention of the stutter.

was receiving specialized support from a special education teacher, Mr. Silberman, that "was not captured" on the IEP.) In so arguing, Plaintiffs rely on two out-of-circuit cases for the proposition that "the failure to include support a student is receiving on an IEP has been found to be justification for a parent unilaterally placing a student." (Pls.' Mem. at 6.) Setting aside whether those cases are truly comparable or analogous, controlling precedent in this Circuit dooms the argument. Our Court of Appeals recently rejected a claim based on an IEP's omission of certain services where the student received them all the same. *Edward M.R.*, 128 F.4th at 294 ("[T]he record shows that [student] *did* receive research-based instruction in speech and language, and in occupational therapy, even if his IEPs were silent on the matter. As such, his substantive rights weren't affected, and his claim fails."). Plaintiffs' argument here likewise fails.[11]

*    *    *

On a careful review, the Court concludes that the Hearing Officer appropriately reevaluated the December IEP on remand, affording due consideration to the entirety of the record and Plaintiffs' various objections and arguments. Stated differently, the Hearing Officer issued "a well-reasoned administrative decision that is supported by the evidence in the administrative record. Nothing more is required to sustain that decision." *Edward M.R. v. Dist. of Columbia*, 660 F. Supp. 3d 82, 116 (D.D.C. 2023), *aff'd*, 128 F.4th 290 (D.C. Cir. 2025). The Court recognizes Plaintiffs' belief that DCPS could have done more to support A.U. through the December IEP, but the Court

---

[11] At another point, Plaintiffs say the Hearing Officer should have considered a variety of testing data and performance results *after* A.U. started at Siena for the 2020–21 school year. (Pls.' Mem. at 43.) That argument fails because none of that information was available to the IEP team at the time they prepared the December 2019 IEP. *Philpot v. Dist. of Columbia*, 2025 WL 1311025, at *4 (D.D.C. May 6, 2025) ("Instead of evaluating an IEP's adequacy based on subsequent progress that a student may or may not achieve, the Court must ask whether the IEP was appropriately designed and implemented so as to convey a meaningful benefit.") (cleaned up) (collecting cases), *report and recommendation adopted*, 2025 WL 1517245 (D.D.C. May 28, 2025); *Pavelko v. Dist. of Columbia*, 288 F. Supp. 3d 301, 308 (D.D.C. 2018) ("[T]he adequacy of an IEP can be measured only at the time it is formulated, not in hindsight.").

remains mindful that the IDEA does guarantee "the best possible education or even a 'potential-maximizing one.'" *Leggett*, 793 F.3d at 70 (quoting *Rowley*, 458 U.S. at 197 n.21). The IDEA requires "an educational program reasonably calculated to enable a child to make *progress* in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403 (emphasis added). And here, the remand determination reasonably concluded that the December 2019 IEP met that obligation.

## II.    Plaintiffs' Requested Relief

Having found that the April and May 2019 IEPs were substantively inadequate, but that the December 2019 was sufficient under the IDEA, the Court turns to potential remedies.

As the Hearing Officer noted, Plaintiffs withdrew their claim for compensatory education at the administrative level, opting instead to seek relief solely in the form of reimbursement for tuition and related expenses for A.U.'s placement at Siena. (RAR at 39 ("Plaintiffs are seeking virtually no relief for the allegedly inappropriate IEPs developed in April and May 2019.").) Plaintiffs do not disagree. They acknowledge they are not seeking compensatory education for the April and May IEPs, but say their complaints about those earlier IEPs "are still relevant" because "DCPS used them as a starting point for the December IEP." (ECF No. 63, Supp. Compl. ¶ 36 n.5.) In any case, the supplemental complaint cabins the relief requested to an award of "all expenses related to the unilateral placement of their son at Siena School related to the 20-21 school year," following the allegedly deficient December 2019 IEP. (*Id.* ¶ 78.)

Because Plaintiffs did not—and do not—seek any relief associated with the deficient April and May 2019 IEPs, the Court does not need to consider any remedy in connection with those claims. Instead, the only remedy that Plaintiffs seek—reimbursement for their unilateral placement at Siena—hinges on a finding that the December 2019 IEP was inadequate. (*See* Pls.' Mem. at 44 (recognizing that their reimbursement claim is contingent on a ruling that "DCPS did not prove

23

the December 2019 IEP appropriate"); *see also* Supp. Compl. ¶ 77 (reflecting that their "Placement Claim" turns on the finding that the December 2019 IEP was inadequate).) And because DCPS provided A.U. with a FAPE through the December 2019 IEP, the Court need not reach Plaintiffs' request for relief in the form of tuition and expense reimbursement. *S.M. v. Dist. of Columbia*, 2020 WL 7230266, at *7 n.3 (D.D.C. Dec. 8, 2020) ("Because the Court has determined that DCPS did not deny [student] a FAPE ... it does not further consider Plaintiffs' request for tuition reimbursement."); *Pinto v. Dist. of Columbia*, 69 F. Supp. 3d 275, 285 (D.D.C. 2014) (similar).

## CONCLUSION AND RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** both Plaintiffs' motion for summary judgment (ECF No. 67) and the District's cross-motion for summary judgment (ECF No. 70). The Court should **GRANT** Plaintiffs' motion as to their claims challenging the substantive adequacy of the April and May 2019 IEPs but **DENY** their motion as to the substantive adequacy of the December 2019 IEP and their request for reimbursement associated with their unilateral placement of A.U. at Siena. The Court should instead **GRANT** the District's motion as to the substantive adequacy of the December 2019 IEP and rule that Plaintiffs are not entitled to their reimbursement remedy.

Dated: August 8, 2025

_____
MATTHEW J. SHARBAUGH
United States Magistrate Judge

\*       \*       \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).